**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**BROOKE J.[1]**

   **Plaintiff,**

          **Civil Action 2:25-cv-160**
 **v.**        **Chief Judge Sarah D. Morrison**
          **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF
SOCIAL SECURITY,**

   **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Brooke J., brings this action under 42 U.S.C. § 405(g) for review of a final

decision of the Commissioner of Social Security ("Commissioner") denying her application for

supplemental security income ("SSI"). This matter is before the United States Magistrate Judge

for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 9), the

Commissioner's Memorandum in Opposition (ECF No. 12), Plaintiff's Reply (ECF No. 13), and

the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED** that

the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's

decision.

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security
cases, any opinion, order, judgment or other disposition in social security cases in the Southern
District of Ohio shall refer to plaintiffs only by their first names and last initials.

1

## I.  BACKGROUND

Plaintiff filed applications for Child Disability Benefits, Disability and Disability Insurance Benefits, and SSI in May 2020, alleging that she has been disabled since June 1, 2007, due to Bipolar I with psychotic features, most recent depressed; generalized anxiety disorder; borderline intellectual functioning; mild alcohol use disorder; chronic asthma; and alpha-1 antitrypsin.  (R. at 501-18, 532.)  Plaintiff's applications were denied initially in August 2020 and upon reconsideration in November 2020.  (R. at 335-401, 426-40.)  Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").  (R. at 441-58.)  ALJ Noceeba Southern held a telephone hearing on August 13, 2021, at which Plaintiff, who was represented by counsel, appeared and testified.  (R. at 288-315.)  A vocational expert ("VE") also appeared and testified.  (*Id.*)  On September 14, 2021, ALJ Southern issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 234-58.)  After the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision, (R. at 13-22) she filed suit in this Court.  *See* [*Brooke J.*] *v. Comm'r of Soc. Sec.*, S.D. Ohio Case No. 2:23-cv-205.  Upon stipulation of the parties, the Court remanded the matter for further proceedings. (R. at 1849-54.)

On remand, the claim was heard by ALJ Jason P. Tepley.  At the hearing, Plaintiff moved to amend her alleged onset date from June 1, 2007, to May 29, 2020.  (R. at 1750 citing R. at 1783-1784.)  That resulted in the effective withdrawal of all claims but her SSI claim.  (R. at 1785.)  After a hearing on September 25, 2024, ALJ Tepley found on October 24, 2024, that

Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the

Social Security Act. (R. at 1746-76.)

Plaintiff did not request review by the Appeals Council opting to directly file suit with

this Court. This matter is properly before this Court for review.

## II. RELEVANT RECORD EVIDENCE

The Undersigned has thoroughly reviewed the transcript in this matter, including

Plaintiff's medical records, function and disability reports and testimony as to her conditions and

resulting limitations. As relevant here, the ALJ summarized Plaintiff's mental health treatment,

characterizing it as medication management and counseling, as follows:

> In June 2020, [Plaintiff] endorsed some stress in the neighborhood due to the kids fighting but that she was encouraging her children to not respond to peers, also noting fairly stable moods with her monthly injectable mood stabilizer and was having a good relationship with her children (Exhibit 1F, page 59). [Plaintiff] also indicated that she was looking forward to her yearly family vacation to Myrtle Beach, was hoping to be able to travel to see her youngest child's father and had an entirely unremarkable mental status examination (Exhibit 1F, pages 59-60). Medication management notes in the same month reflected use of Invega Sustenna by injection (Exhibit 10F, page 9). Mental health notes in August 2020, showed [Plaintiff] reporting having attended her family vacation, was off diet pills temporarily, and was happy with her medication and had not been irritable (Exhibit 10F, page 14). Psychiatric examination was wholly unremarkable (Exhibit 10F, pages 18-19).
>
> Notes in September 2020 showed financial stressors, food insecurities, and continued mental health symptoms (Exhibit 7F, page 65). In October 2020, [Plaintiff] reported frustration with COVID, family stressors including an overdose attempt by her son, and her daughter's depression (Exhibit 7F, page 67). Mental status examination showed a depressed mood and circumstantial thought processes, but normal speech and fair insight and judgment (Exhibit 7F, page 67). Follow up in November showed [Plaintiff] was struggling to take her medications, was having troubled sleep, and high anxiety due to COVID and family stressors (Exhibit 7F, page 69). Counseling and supportive therapy was provided (Exhibit 7F, page 70). Medication management notes in November 2020 showed [Plaintiff] continued on

3

her injection Invega Sustenna and Fluoxetine, with [Plaintiff] counseled regarding smoking cessation and lifestyle changes (Exhibit 10F, page 31).

Medication management notes in December 2020 showed reports of doing better with Prozac, sleeping well, with improved energy and motivation, and improved mood (Exhibit 13F, page 13). Continued medication management with monthly Invega Sustenna ordered in addition to lifestyle changes recommended (Exhibit 13F, page 20). Counseling notes in January 2021 showed [Plaintiff] had a wonderful Christmas and New Years with her family, was able to see her brother and enjoyed time with him, and that she had positive interaction with her children and family of origin (Exhibit 14F, page 9). [Plaintiff] also indicated she had purchased a 12-pack of beer as a reward, with [Plaintiff] counseled regarding healthier choices (Exhibit 14F, page 9). Case management notes in February 2021, noted [Plaintiff] had not had a drink in a couple of weeks but was struggling with alcohol cravings and was also struggling with making healthier meals (Exhibit 15F, page 5).

Medication management notes in April 2021 were notable for reports that [Plaintiff]'s energy was poor, that she was sedentary, and even when she wanted to go outside and enjoy the weather, she gets nervous and her body does not want to move (Exhibit 21F, page 2). Psychiatric exam was generally unremarkable with [Plaintiff] noted as having clear and linear thought processes, intact judgment and insight, no apparent impairment in recent or remote memory, appropriate mood, with an anxious affect (Exhibit 21F, pages 6-7). [Plaintiff] was advised to continue her medication regimen, stop smoking, improve her diet, and increase physical exercise (Exhibit 21F, page 9). Case management notes on April 22, 2021, showed [Plaintiff] requesting assistance with completing a "huge packet of a bunch of forms" for her child's SSI benefit review (Exhibit 21F, page 13). [Plaintiff]'s case manager continued to provide assistance to [Plaintiff] in maintaining her child's disability benefits through May 2021 (Exhibit 21F, pages 15-23). Behavioral health follow-up in June 2021, showed [Plaintiff] reporting poor hygiene, lack of motivation, poor energy, not caring for her household, and drinking alcohol (Exhibit 22F, page 4). Mental status exam noted [Plaintiff] was cooperative with and anxious and depressed mood, goal directed thought processes, normal insight and judgment, and orientation times four (Exhibit 22F, page 4). [Plaintiff] was provided cognitive behavioral therapy and noted to appear resistant to change, advised to attend AA, and keep her appointment and routine/structure daily (Exhibit 22F, page 4).

Case management notes on August 13, 2021, reflected that the case manager "assisted" [Plaintiff] "with her Administrative Hearing to obtain her Social Security," providing "support as client participated in the hearing and monitored

symptoms," and reminding [Plaintiff] "to count to three before answering questions to enable her to calm her mind and focus on how she would like to answer" (Exhibit 23F, page 2). Behavioral health treatment notes in the same month noted continued stress in her neighborhood, staying in the house more, reported continued attempts to hold her children more accountable to help, and discussed her daughter's boyfriend and the struggle she is having with getting him to contribute to the household if he is living there (Exhibit 24F, page 7). She noted concerns regarding her eldest son's health as he was not taking medication or engaged in treatment, that she was trying to be supportive and lead by example, was looking forward to her children going back to school for the routine and time to herself to engage in self-care, and noting getting exhausted doing housework (Exhibit 24F, page 7). Mental status examination was notable for an anxious mood and mood-congruent affect, normal speech, normal thought processes, fair insight, and judgement, and was alert and oriented to person, place, time, and situation (Exhibit 24F, pages 7-8). [Plaintiff] was noted has having stable symptoms and provided cognitive behavioral therapy to develop coping skills (Exhibit 24F, page 8). Medication management notes in December 2021, showed [Plaintiff] continued on Invega Sustenna, although having received it later and was having increased anxiety and irritability symptoms (Exhibit 29F, pages 1-11).

Behavioral health notes in February 2022 showed [Plaintiff] reporting being under lots of stress, and that she had been drinking again and it was causing significant issues for her health as well as for her interactions with her family (Exhibit 28F, page 6). [Plaintiff] reported having little motivation or energy when she was drinking, that it makes her feel sick the next day, but was planning to attend an "AA meeting" (Exhibit 28F, page 6). [Plaintiff] was provided cognitive behavioral therapy and a list of AA meetings near her home (Exhibit 28F, pages 7-11).

Counseling notes in May 2022, reflected complaints of shortness of breath and noting it was a barrier to her self-care and hygiene (Exhibit 28F, page 12). Medication management notes in the same month showed increased anxiety in the context of having run out of Prozac a month ago, and was requesting Buspirone for anxiety (Exhibit 29F, page 20). However, by July 2022, [Plaintiff] endorsed showing more often, feeling like she is engaged in better self-care, and noted improvement in energy and motivation with medication compliance (Exhibit 28F, page 14).

Interestingly, medication management notes in the same month showed [Plaintiff] reporting having not seen her counselor lately as well as not taking Buspirone even though it had been helpful when she started it, and that she had not been using her CPAP therapy machine (Exhibit 29F, page 24). Mental status examination however

was unremarkable, with Prozac restarted, Buspirone compliance counseled, and continued use of Invega Sustenna ordered (Exhibit 29F, pages 28-31).

Medication management notes in September 2022 showed [Plaintiff] reporting feeling upset that her daughter was moving out and that she was having interpersonal problems with her son, and improved energy with CPAP use (Exhibit 29F, page 46). Psychiatric examination reflected impair attention span/distractibility but was otherwise unremarkable, with [Plaintiff] continued on chronic medications, and started on an increased dosage of D3 (Exhibit 29F, pages 51-54).

Follow up in October 2022, reflected reports that [Plaintiff] was doing remodeling with her family and was getting ready to paint and put wood flooring down (Exhibit 35F, page 58). Psychiatric examination was completely unremarkable, with chronic medications refilled and increased physical activity and smoking cessation advised (Exhibit 35F, pages 63-65).

In December 2022, [Plaintiff] reported that her mother was living with her now, noting working on improving their communication, and endorsed stressors like limited transportation and different views on how things in the home should be handled (Exhibit 30F, page 33). Mental status examination showed an anxious and depressed mood, normal thought processes, alert and oriented x4, and normal insight and judgement (Exhibit 30F, pages 33-34). Cognitive behavioral therapy was provided, with instructions for [Plaintiff] to keep a routine/daily structure, focus on the present, and engage in positive self-talk (Exhibit 30F, page 34). In January 2023, [Plaintiff] reported writing in her journal, taking Prozac, and doing well, but having been in a slump for a week and had not showered or left the house, with counseling and therapy provided (Exhibit 30F, page 35).

In July 2023, [Plaintiff] noted struggling with depression, motivation, and energy, as well as with breathing and mobility (Exhibit 30F, page 38). Behavioral health notes in August 2023 showed [Plaintiff] reported an interaction with her son's girlfriend and her mother, where she was at their house and was intoxicated and unruly (Exhibit 30F, page 67). Mental status reflected normal speech, mood, and thought processes, cooperative behavior, and fair insight and judgment (Exhibit 30F, page 68). [Plaintiff] was provided counseling for coping and stress management skills (Exhibit 30F, page 68). Medication management notes in the same month showed reports of increased mental health symptoms due to missing her shot, with her Invega Sustenna restarted at her request (Exhibit 35F, page 69). Follow up later that month reflected no mental health complaints and specifically denying hallucinations, delusions, suicidal or homicidal ideation, and was able to advocate for a "pet letter" which was provided to her (Exhibit 35F, page 88).

Notes in November 2023 showed reports of conflict with her daughter, but spending time with her children, improved hygiene, working on taking the garbage out once per week, and plans to decrease smoking (Exhibit 30F, page 74). Mental status exam was notable for an anxious and depressed mood, circumstantial thought processes but appropriate speech, normal insight and judgment, and a cooperative attitude (Exhibit 30F, page 75). In December 2023, [Plaintiff] was started on Minipress for complaints of nightmares (Exhibit 35F, page 112). Counseling notes in January 2024, showed [Plaintiff] planning on looking into groups with her behavioral health provider and possibly going back to "AA," as well as plans to go over to her daughter's home and spend time with her daughter and grandchild (Exhibit 30F, page 78). Follow up counseling in February 2024, showed [Plaintiff] reported that her daughter did not want her around the baby because [Plaintiff] was still smoking, making [Plaintiff] upset and isolate more (Exhibit 30F, page 80). [Plaintiff] planned to decrease smoking with plans to track the same (Exhibit 30F, pages 80-81). Mental status continued to reflect an anxious and depressed mood and circumstantial thought process, but was otherwise unremarkable (Exhibit 30F, page 81).

Medication management notes in March 2024, showed [Plaintiff]'s frequency of Invega injections increased to every 3 weeks due to [Plaintiff] reported increase of symptoms on the third week (Exhibit 35F, pages 116-124). Later that month, [Plaintiff] noted significantly improved mood and motivation and improvement in her anxiety, with a completely unremarkable mental status examination (Exhibit 30F, page 83). Case management notes in April 2024, showed [Plaintiff] contacting her case manager to report that her daughter is pregnant and wanting to locate resources for her, as well as having missed her own injection and several appointments (Exhibit 35F, page 256).

(R. at 1759-62.)

## III.   ADMINISTRATIVE DECISION

On October 22, 2024, the ALJ issued his decision.  (R. at 1746-76.)  The ALJ granted

Plaintiff's motion to amend her alleged onset date to May 29, 2020.  (R. at 1753.)  At step one of

the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in substantially gainful activity since May 29, 2020, the amended alleged onset date. (*Id.*) The ALJ found that Plaintiff had the severe impairments of obesity; asthma; headaches; anxiety disorder; mood disorder; obsessive compulsive disorder; bipolar disorder; schizoaffective disorder; borderline intellectual functioning; and a history of alcohol dependence. (*Id.*) He further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 1753.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except: can occasionally climb ramps/stairs; occasionally kneel, crouch, stoop, and crawl; can never climb ladders, ropes, or scaffolds; can have occasional exposure to extreme heat, extreme cold, and atmospheric conditions as defined in the *Selected Characteristics of Occupations* (SCO); can have no exposure to

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> unprotected heights, moving mechanical parts; and is unable to perform commercial driving. [Plaintiff] can carry out simple tasks, with no work that requires satisfaction of production quotas or that involves assembly line pace; can make simple work-related decision; can have occasional interaction with coworkers and supervisors, with no interaction with the general public; and can deal with occasional changes in a routine work setting which are explained in advance.

(R. at 1755-56.)

Plaintiff has no past relevant work. (R. at 1765.) Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy, such as an ink printer, final assembler, or stuffer. (R. at 1766-67.) He therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since May 29, 2020. (R. at 1767.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives [Plaintiff] of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff raises two claimed errors, both limited to matters relating to her mental health impairments. First, she asserts that the ALJ erred by failing to properly evaluate the opinions of her treating counselor, Lindsey Cornett, LISW. (ECF No. 9 at PageID 2978-2982.) Further, Plaintiff contends that the ALJ failed to properly account for the state agency psychologists' opined restrictions. (*Id.* at PageID 2983-86.)

## A. The ALJ Properly Considered the Supportability of Lindsey Cornett's Opinion

Turning first to the issue of the ALJ's evaluation of Ms. Cornett's opinion, Ms. Cornett completed a largely check-box form questionnaire on Plaintiff's behalf of April 8, 2021. In that questionnaire, she assessed Plaintiff as being "unable to meet competitive standards" and having "no useful ability to function" in most mental ability areas. (R. at 1686-87.) Specifically, Ms.

10

Cornett opined that Plaintiff was seriously limited in her ability to carry out, understand and remember very short and simple instructions. (R. at 1686.) Plaintiff was also found to be seriously limited in her ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) By way of narrative explanation, Ms. Cornett stated that Plaintiff engaged in unhealthy thinking/cognitive distortions "that impede her ability to follow directions, carry out tasks, make informed decision and regulate mood when there is a lot of input from her environment." (*Id.*). She also noted that Plaintiff "becomes overwhelmed very easily and requires high levels of instruction, modeling, and supervision to complete tasks." (R. at 1687.) She further opined that Plaintiff would be expected to be absent from work more than four days per month. (*Id.*).

Ms. Cornett completed a second largely check-box questionnaire on September 16, 2024, in which she identified a range of marked to extreme limitations in every functional area, including social interaction, sustained concentration and persistence, and adaptation. (R. at 2925-27.) When responding to the question regarding whether her answers with respect to social interaction would change if Plaintiff was limited to "only minimal contact or interaction with others," Ms. Cornett narratively opined that "most areas would be reduced to 'moderate' …" (*Id.* at 2925.) She indicated that Plaintiff has "high social anxiety when around others" and that stress and overstimulation causes panic attacks often followed by severe depressive episodes. (*Id.* at 2927.) Ms. Cornett further believed that Plaintiff would likely experience two or more unscheduled absences per month due to her diagnoses and/or medication side effects, and that her condition would likely deteriorate if placed under stress. (*Id.*)

By way of additional background, the ALJ, having outlined Plaintiff's mental health treatment history as set forth above, summarized the record in this way:

> Regarding the claimant's alleged mental impairments, the record contains a limited treatment history which was entirely conservative in nature. At no time did the claimant require emergency or inpatient treatment for any alleged mental health concern. Additionally, the claimant was generally managed by behavioral health for medication management and therapy. Mental status examinations of record were generally unremarkable with respect to any finding other than mood and affect, which were only occasionally depressed or anxious, however additional limitations were noted during instances of alcohol relapse, periods of medication non-compliance, and increased personal and life stressors. It is notable that the claimant recognized the complicating impact alcohol use had on her mental health, and few if any instances of AA attendance despite recommendations for the same during the period at issue (Exhibit 28F, pages 6-11). The claimant was able to maintain general independence with her activities of daily living including personal hygiene and dressing, was able to interact appropriately with family and treatment providers, able to provide childcare to her three children including one child who was disabled, engage in home improvement, was able to drive, able to attend family vacation, able to interact with her grandchild, advocating for herself and her family, and seeking out treatment as needed. …

(R. at 1763.)

The ALJ proceeded to find Ms. Cornett's assessments "unpersuasive," explaining as follows:

> Ms. Cornett does not specifically identify any support from objective treatment evidence during the period at issue to bolster the finding made with respect to functional limitations. [Plaintiff]'s ability to care for her three children, with at least one on disability, her ability to seek out community resources and treatment as needed, and her ability to live independently and maintain independence with respect to her activities of daily living stand in stark contrast to Ms. Cornett's extreme restrictions. As noted above, the while the record does show instances of depressed and anxious mood, circumstantial thought processes, and limited insight/judgment, the bulk of [Plaintiff]'s mental health treatment record showed limited if any mental status examination findings with treatment compliance. As reflected above, there are numerous instances of issues with medication compliance, at times due to running out, and other times due to missed appointments, but no indications that even during these instances that [Plaintiff]

experienced disabling symptomology. Further, numerous recent examinations reflect significantly less symptomatology than Ms. Cornett opines (see, e.g., Ex. 29F/7, 18, 29; 34F/13, 15, 22).

(R. at 1765.)

Against this backdrop, Plaintiff contends that the ALJ did not adequately consider the supportability factor when evaluating Ms. Cornett's opinion.  For claims for Supplemental Security Income filed after March 27, 2017, such as this one, medical opinions are considered per 20 C.F.R. § 416.920c. Under those regulations, an ALJ does "not defer or give any specific evidentiary weight ... to any medical opinion(s)." 20 C.F.R. § 416.920c(a). Rather, "[w]hen a medical source provides one or more medical opinions ..., [the ALJ] will consider those medical opinions ... from that medical source together using" factors outlined in the Code of Federal Regulations.  *Id.*  The factors an ALJ must consider when evaluating the persuasiveness of a medical opinion are: supportability, consistency, relationship with the claimant, specialization, and any other factors that support or contradict the medical opinion.  20 C.F.R. § 416.920c(c)(1)–(5).  The most important factors, however, are supportability and consistency. 20 C.F.R. § 416.920c(a), (b)(2).

An ALJ must articulate in their decision how persuasive they found the medical opinion. 20 C.F.R. § 416.920c(b).  Moreover, because supportability and consistency are the most important factors, an ALJ must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinion[ ]."  20 C.F.R. § 416.920(b)(2).  The ALJ may, but is not required to, explain how they considered the other factors.  *Id.*  With regard to supportability, "[t]he more relevant the objective medical evidence and supporting

13

explanations presented by a medical source are to support his or her medical opinion[ ] ..., the more persuasive the medical opinions ... will be." 20 C.F.R. § 416.920c(c)(1).

In Plaintiff's view, the ALJ's cursory conclusion that Ms. Cornett "did not specifically identify any support from objective treatment evidence" is not supported by substantial evidence. Thus, Plaintiff argues that the ALJ erred in his consideration of the supportability factor, not that the ALJ improperly failed to consider that factor. This is so, according to Plaintiff, because Ms. Cornett provided support for her opinions within the four corners of both medical source statements and her notes. In support, Plaintiff cites both the narrative portions of Ms. Cornett's assessments and her treatment notes spanning several years. In response, the Commissioner asserts that Plaintiff's argument is an impermissible request to reweigh the evidence of record. Plaintiff does not address the issue further in her reply.

Upon review of the record, the Undersigned concludes that the Commissioner has the better argument here and that the ALJ's conclusion on this issue is supported by substantial evidence. To be sure, as Plaintiff notes and the ALJ recognized, Ms. Cornett's findings reflect that Plaintiff's mood frequently was anxious and depressed. Plaintiff also points out that she met regularly with Ms. Cornett over many years for individual therapy sessions. Beyond this, however, Plaintiff's argument relies on her self-reports to Ms. Cornett regarding her mental health issues. Thus, even by Plaintiff's own description of the record, the ALJ was correct in his assessment that "the bulk of [Plaintiff's] mental health treatment record showed limited if any mental examination findings with treatment compliance." (R. at 1765; *see also* R. at 2152-2195; 2344-2457; 2639-2662.) Moreover, the ALJ fairly summarized Plaintiff's treatment

14

record as containing "a limited treatment history which was entirely conservative in nature." (R. at 1763.) The ALJ also correctly noted that "[a]t no time did the claimant require emergency or inpatient treatment for any alleged mental health concern." (*Id*.) Plaintiff does not seriously dispute the ALJ's characterizations of her treatment history. In short, consistent with the ALJ's finding, the record shows that Ms. Cornett's documented findings undermine her conclusions regarding the severity of the opined limitations.

Thus, the ALJ's supportability analysis is supported by substantial evidence. Plaintiff's limited argument to the contrary is merely "a veiled attempt to have [this Court] reweigh the evidence." *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022). It is not this Court's role, however, to reweigh the evidence presented to the ALJ or second guess their decision. *See, e.g.*, *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (noting that the court "reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ"). Accordingly, Plaintiff's first issue does not warrant remand.

**B**. **The ALJ Properly Accounted for the State Agency Psychologists' Opined Restrictions**

Turning to the matter of the state agency psychologists' opinions, Paul Tangeman, Ph.D. evaluated Plaintiff's mental impairments as part of the initial determination on the claim on August 17, 2020. (R. at 338-48.) Dr. Tangeman based his review on following severe medically determinable mental impairment: Depressive, Bipolar and Related Disorders; Anxiety and Obsessive-Compulsive Disorders; Borderline Intellectual Functioning; and the non-severe

impairment of Substance Addiction Disorders (Alcohol). (R. at 343.) Dr. Tangeman did not find that these impairments meet or medically equal any Listed impairment, finding moderate limitations [with when evaluating the "paragraph B" criteria of the mental Listings. (*Id.*) Dr. Tangeman then provided an assessment of Plaintiff's mental residual functional capacity (MRFC). (R. at 346-47.) Dr. Tangeman found Plaintiff capable of performing simple work tasks, retaining the ability to complete simple tasks in a routine environment without high production or pace quotas, with superficial contact with others, and with changes explained in advance. (*Id.*)

In arriving at his findings regarding the severity of Plaintiff's mental impairments and resulting MRFC, Dr. Tangeman's assessment refers to Plaintiff's psychological consultative examination report. (R. at 340.) In arriving at the limitations in understanding and memory, Dr. Tangeman stated that Plaintiff is moderately limited in the ability to understand and remember detailed instructions. (R. at 346.) In arriving at the limitations in sustained concentration and persistence, Dr. Tangeman stated that Plaintiff is moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 346-47.) In arriving at the limitations in social interactions, Dr. Tangeman stated that Plaintiff is moderately limited in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (R. at 347.) In

addition, he provided narrative explanations for each of his findings regarding the four functional areas considered in arriving at Plaintiff's MRFC. (R. at 346-47.)

On reconsideration, Plaintiff's claim was evaluated by Bonnie Katz, Ph.D. who, like Dr. Tangeman, assessed Plaintiff's medically determinable mental impairments, considered any applicable Listings, and made findings regarding Plaintiff's MRFC. (R. at 374-82.) Dr. Katz reached the same conclusions as Dr. Tangeman regarding the evaluation of the "paragraph B" criteria of the Listings and Plaintiff's MRFC. (R. at 377, 380-81.)

The ALJ had this to say about those opinions:

The undersigned has also considered the State agency psychological consultant's opinions which initially assessed the claimant capable of performing simple work tasks, retains the ability to complete simple tasks in a routine environment without high production or pace quotas, with superficial contact with others, and changes should be explained in advance (Exhibits 4A; 5A; 6A). This assessment was affirmed at reconsideration (Exhibits 10A; 11A; 12A). The undersigned notes that terminology used is not vocationally defined – such as "superficial" – which significantly limits the probative value of the finding. As such, the undersigned finds it persuasive only persuasive to the extent it finds no more than moderate psychological limitations. This is supported by the consultants' citation to specific evidence of record. Further, it is consistent with the overall record, which shows, despite multiple diagnosed mental impairments, objective findings suggestive of no more than moderate symptoms (see, e.g., Ex. 29F/7, 18, 29; 34F/13, 15, 22).

(R. at 1764.)

As noted above, consistent with these findings, the ALJ included a social interaction limitation in the RFC restricting Plaintiff to "occasional interaction with coworkers and supervisors" and "no interaction with the general public." (R. at 1756.) Plaintiff argues that the ALJ erred by failing to include a limitation to "superficial" interaction with others. To be clear, because the RFC limited Plaintiff to "no interaction with the general public," Plaintiff's

argument more precisely is directed to the limitation as to "occasional interaction with coworkers and supervisors."  In Plaintiff's view, the terms "occasional" and "superficial" are not interchangeable and a limitation to occasional interaction did not account for a limitation to superficial interaction.  According to Plaintiff, this resulted in an inconsistency between the RFC and the evidence which the ALJ was required to address under SSR 96-8p.  To the extent the ALJ stated that the term "superficial" is not vocationally defined, Plaintiff contends that the term remains relevant and not subject to being ignored by the ALJ.

In response, the Commissioner asserts that the ALJ's RFC formulation as it relates to Plaintiff's social interaction limitations is supported by substantial evidence.  Thus, in the Commissioner's view, Plaintiff's arguments are unavailing for several reasons.  First, according to the Commissioner, the ALJ specifically found that the assessments were persuasive only to the extent that they support a finding of no more than moderate psychological limitations and, thereby, rejected the specific functional limitations.  Further, the Commissioner notes the ALJ's evaluation of Plaintiff's social interactions, including her ability "to interact appropriately with health care providers, interact with her family[,]" "interact with others at Alcoholics Anonymous and make friends[,]" and "to take family and other vacations throughout the period at issue suggest[ed] greater functional ability than alleged."  (ECF No. 12 at 11 citing R. at 1754.) Finally, the Commissioner contends that the ALJ was within his authority to craft the RFC as he chose because doing so is solely his responsibility.

In reply, Plaintiff contends that a limitation to superficial interaction is synonymous with a moderate limitation in social interaction.  Thus, according to Plaintiff, to the extent that the ALJ

18

found that she was no more than moderately limited in her ability to interact with others, the ALJ was required to explain the inconsistency created by his rejection of a limitation to superficial interaction.

Initially, an ALJ is not required to adopt all of the limitations suggested in prior administrative medical findings or medical opinions, even if the ALJ has found the prior administrative medical findings or opinions to be persuasive. *See generally,* 20 C.F.R. §§ 404.1520c; 419.920c. The ALJ – while not a physician – is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546(c); *Pitrman v. Comm'r of Soc. Sec.*, No. 3:15-cv-1503, 2023 WL 3510752, *13 (N.D. Ohio April 10, 2023). When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding…[and] and ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding. *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009).

"[E]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  Further, an ALJ is not obligated to explain each limitation or restriction adopted or not adopted. *Pitrman*, 2023 WL 3510752, at *14. "The ALJ is not required to describe the claimant's limitation using the exact language of those medical sources as long as substantial evidence demonstrates that the ALJ adequately portrayed the claimant's limitations in the RFC."

19

*Aerial T. v. Comm'r of Soc. Sec.*, No. 2:23-cv-04188, 2025 WL 798367, at *3 (S.D. Ohio Mar. 13, 2025).

Contrary to Plaintiff's position, the Undersigned finds that the ALJ met his burden of articulation here. The ALJ correctly noted that the term superficial is not a vocationally defined term. *Dawn M. v. Comm'r of Soc. Sec.,* No. 3:24-CV-02, 2024 WL 3568859, at *6 (S.D. Ohio July 29, 2024), *aff'd sub nom. Mabry-Schlicher v. Comm'r of Soc. Sec.,* No. 24-3811, 2025 WL 1604376 (6th Cir. June 6, 2025) (citing *Stephen D. v. Comm'r of Soc. Sec.,* No. 1:21-CV-00746, 2023 WL 4991918, at *1 (S.D. Ohio Aug. 4, 2023), *report and recommendation adopted,* 734 F. Supp. 3d 729 (S.D. Ohio 2024)). The ALJ then found the use of the word "superficial" persuasive only to the extent that it was suggestive of no more than moderate psychological limitations. This allows a reasonable subsequent reviewer to conclude that the ALJ plainly was rejecting the use of that term.

The ALJ then went on to account for the Plaintiff's moderate social interaction limitations by limiting Plaintiff to only occasional interaction with coworkers and supervisors. Such a limitation properly accounted for Plaintiff's moderate limitation in interacting with others. *See Reeves,* 618 F. App'x 267, 275 (noting that the ALJ accounted for the plaintiff's moderate limitation in his ability to interact with the public by limiting him to "occasional interaction with the public"); *Cummings v. Comm'r of Soc. Sec.*, No. 3:24-CV-1368, 2025 WL 1949499, at *13 (N.D. Ohio July 16, 2025) (affirming the ALJ's decision that "accounted for [the claimant's] moderate limitations in interacting with others by limiting her to 'occasional interaction with the public, coworkers, and supervisors.' "); *Bryan v. Comm'r of Soc. Sec.*, No. 2:18-cv-554, 2019

20

WL 2912089, at *3-4 (S.D. Ohio July 8, 2019) (affirming the ALJ's decision where the plaintiff had moderate limitations in interacting with others and the ALJ limited the RFC to occasional interactions with others); *Beemer v. Comm'r of Soc. Sec.*, No. 1:14-cv-678, 2015 WL 4546520, at *6 (W.D. Mich. July 28, 2015) ("[T]he Court finds no inconsistency between the doctor's opinion that plaintiff had ... moderate limitations related to interacting with others ... and the ALJ's RFC, which limited plaintiff 'to simple, routine, and repetitive tasks' and 'occasional interaction with coworkers, supervisors, and the public[.]' "). And, importantly, Plaintiff fails to show that she was more limited in interacting with coworkers or supervisors than the ALJ found. Indeed, Plaintiff essentially concedes that her social interaction limitations were appropriately characterized as moderate.

Finally, there is no merit to Plaintiff's claim that the ALJ created a "glaring inconsistency" which he was required to address. (ECF No. 9 at 14.) Fundamentally, an ALJ is not required to explain every departure from a medical opinion to which he has given only "partial weight." SSR 96-8p requires only that an RFC assessment include an explanation of "how any *material inconsistencies* or ambiguities in the evidence ... were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7 (1996) (emphasis added). SSR 96-8p also requires ALJs to "explain why" a medical opinion was not adopted if the ALJ's RFC assessment conflicts with an opinion from a medical source. *Id.* As this Court has recognized, "'occasionally' does not create a sufficient conflict with "superficially" when applied to "interactions," such that the ALJ would be required to explain that change.'" *Stephen D*., 734 F.Supp.3d at 738. That is,

21

> when a person is limited to engaging in only short and infrequent interactions, that strongly correlates, as a practical matter, with interactions that are **superficial**, as well. Given the correlation between the two, the ALJ's decision to use "occasional" instead of "**superficial**" as applied to "interactions" in calculating the mental **RFC** suggests that no real conflict exists. And, in turn, that means there is no "inconsistency" that the ALJ must explain.

*Id.* Thus, "[a]n ALJ need not explain his failure to use a specific adjective like 'superficial' contained in a consultant's report when: (1) the term is rejected on grounds that it is vocationally undefined; (2) the term is not inconsistent with the RFC as determined; and (3) the ALJ found the opinion to be persuasive only in part." *Dawn M.,* 2024 WL 3568859, at *7 (citing *Reeves*, 618 Fed. Appx. at 275). That is the situation here. Accordingly, Plaintiff's second statement of error does not require remand.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is therefore, **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED.**

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report an\d Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a forfeiture of the right to *de novo* review by the District Judge and forfeiture of the right to appeal the judgment of the District Court.  Even when timely objections are filed, appellate review of issues not raised in those objections is forfeited.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**Date: December 19, 2025**                     *s/ Elizabeth A. Preston Deavers*
                                                                      **ELIZABETH A. PRESTON DEAVERS**
                                                                      **UNITED STATES MAGISTRATE JUDGE**

23